1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KEISHON GIPSON, individually, and on          No.  1:20-cv-00392-DAD-SKO
     behalf of other members of the general
12   public similarly situated,

13                  Plaintiff,                       ORDER GRANTING MOTION TO REMAND
                                                     AND REMANDING THIS ACTION TO
14          v.                                       TULARE COUNTY SUPERIOR COURT

15   CHAMPION HOME BUILDERS, INC.,                   (Doc. No. 10)

16                  Defendant.

17

18          This matter is before the court on plaintiff's motion to remand this action to the Tulare

19   County Superior Court.  (Doc. No. 10.)  Pursuant to General Order No. 617 addressing the public

20   health emergency posed by the coronavirus outbreak, on April 22, 2020, the court took this matter

21   under submission to be decided on the papers, without holding a hearing.  (Doc. No. 12.)  For the

22   reasons set forth below, the court will grant plaintiff's motion to remand.

23                                      **BACKGROUND**

24          Plaintiff Keishon Gipson ("plaintiff") initiated this putative class action in Tulare County

25   Superior Court on February 7, 2020.  (Doc. No. 1-1 ("Compl.").)  In the complaint, plaintiff

26   brings ten causes of action alleging that his employer, defendant Champion Home Builders, Inc.

27   ("defendant"), violated California labor law by failing to pay overtime wages, pay meal and rest

28   period premiums, pay minimum wages, timely pay final wages, timely pay wages during

                                                1

employment, provide compliant wage statements, keep requisite payroll records, and reimburse business expenses.  (*Id*.)  Plaintiff asserts that defendant violated California Business and Professions Code §§ 17200, *et seq*., by engaging in unfair and unlawful business practices.  (*Id*.)

In his complaint, plaintiff also alleges that he is a resident of California, and he worked as an hourly-paid, non-exempt employee for defendant from approximately January 2019 to August 2019.  (*Id*. at ¶¶ 5, 7, 18.)  Plaintiff seeks to represent a proposed class defined as:  "All current and former hourly-paid or non-exempt employees who worked for any of the Defendants within the State of California at any time during the period from four years preceding the filing of this Complaint to final judgment and who reside in California."[1]  (*Id*. at ¶¶ 12, 13.)

According to plaintiff, defendant "engaged in a pattern and practice of wage abuse against [its] hourly-paid or non-exempt employees within the State of California," which "involved, *inter alia*, failing to pay them for all regular and/or overtime wages earned and for missed meal periods and rest breaks in violation of California law."  (*Id*. at ¶ 25.)  Plaintiff alleges that common questions of law or fact exist as to all putative class members, including "[w]hether defendant[] had a policy and practice of failing to pay [its] hourly-paid or non-exempt employees within the State of California for all hours worked and missed (short, late, interrupted and/or missed altogether) meal periods and rest breaks . . .."  (*Id*. at ¶ 16.)

On March 16, 2020, defendant timely removed this action to this court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  (Doc. No. 1.)  In support of its notice of removal, defendant concurrently filed the declaration of Ryan Boehm, defendant's HR Director, ("the Boehm Declaration).  (Doc. No. 1-5.)  On April 21, 2020, plaintiff filed the pending motion to remand this action to the Tulare County Superior Court, contending that defendant has failed to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million as required by CAFA.  (Doc. No. 10 at 2.)  On May 19, 2020, defendant filed

/////

---

[1]  Although the class definition refers to "Defendants" in the plural, Champion Home Builders, Inc. is the only named defendant in plaintiff's complaint, which also lists DOES 1 through 100 as defendants.  (Compl. at ¶¶ 8–10.)

2

1   its opposition to plaintiff's motion to remand, and on May 26, 2020, plaintiff filed his reply

2   thereto.  (Doc. Nos. 13, 14.)

3       On June 4, 2020, the court ordered the parties to submit additional evidence regarding the

4   amount in controversy.  (Doc. No. 15.)  On June 25, 2020, defendant submitted defense counsel

5   Julia A. Luster's declaration and exhibits, including a copy of plaintiff's time records from his

6   employment with defendant and a declaration from defendant's expert, Joseph Krock, Ph.D.,

7   ("the Krock Declaration") (Doc. Nos. 17, 17-1.)  For his part, plaintiff submitted a declaration

8   from plaintiff's counsel Jeffrey D. Klein, which also attached plaintiff's time records as an

9   exhibit.  (Doc. Nos. 18; 18-3.)

10                                    **LEGAL STANDARD**

11      A suit filed in state court may be removed to federal court if the federal court would have

12  had original jurisdiction over the suit.  28 U.S.C. § 1441(a).  Removal jurisdiction is based

13  entirely on federal statutory authority.  *See* 28 U.S.C. §§ 1441, *et seq.*  Under CAFA, federal

14  courts have jurisdiction "over certain class actions, defined in [28 U.S.C.] § 1332(d)(1), if the

15  class has more than 100 members, the parties are minimally diverse, and the amount in

16  controversy exceeds $5 million."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S.

17  81, 84–85 (2014) (citing *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013)).

18  "Congress designed the terms of CAFA specifically to permit a defendant to remove certain class

19  or mass actions into federal court."  *Ibarra v. Manheim Invs. Inc.*, 775 F.3d 1193, 1197 (9th Cir.

20  2015).  "[N]o antiremoval presumption attends cases invoking CAFA."  *Dart Cherokee*, 574 U.S.

21  at 89.

22      A notice of removal must "contain[] a short and plain statement of the grounds for

23  removal."  *Id.* at 87 (quoting 28 U.S.C. § 1446(a)).  For removal under CAFA, as the Supreme

24  Court has explained, the notice of removal "need include only a plausible allegation that the

25  amount in controversy exceeds the jurisdictional threshold."  *Id.* at 89.  "[A] removing

26  defendant's notice of removal 'need not contain evidentiary submissions.'"  *Arias v. Residence*

27  *Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) (quoting *Ibarra*, 775 F. 3d at 1197).  The

28  amount in controversy alleged in defendant's notice of removal "should be accepted when not

1    contested by the plaintiff or questioned by the court." *Dart Cherokee*, 574 U.S. at 87.  "Evidence

2    establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the

3    court questions, the defendant's allegation."  *Id*. at 89.  When the defendant's assertion of the

4    amount in controversy is challenged, "both sides submit proof and the court decides, by a

5    preponderance of the evidence, whether the amount-in-controversy requirement has been

6    satisfied."  *Id*. at 88.  A preponderance of the evidence standard requires that the defendant

7    "provide evidence establishing that it is 'more likely than not' that the amount in controversy

8    exceeds" the jurisdictional threshold.  *Sanchez v. Monumental Life Ins. Co*., 102 F.3d 398, 404

9    (9th Cir. 1996).  Removal is proper "'if the district court finds, by a preponderance of the

10   evidence, that the amount in controversy exceeds' the jurisdictional threshold."  *Dart Cherokee*,

11   574 U.S. at 88.

12        "The amount in controversy is simply an estimate of the total amount in dispute, not a

13   prospective assessment of defendant's liability."  *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395,

14   401 (9th Cir. 2010).  It "reflects the *maximum* recovery the plaintiff could reasonably recover."

15   *Arias*, 936 F.3d at 927 (citing *Chavez v. JPMorgan Chase & Co*., 888 F.3d 413, 417 (9th Cir.

16   2018) (explaining that the amount in controversy includes all amounts "at stake" in the litigation

17   "whatever the likelihood that [the plaintiff] will actually recover them")).

18        To determine the amount in controversy, courts look first to the complaint, and generally

19   the sum claimed by the plaintiff controls if his claim appears to be made good faith.  *Ibarra*, 775

20   F. 3d at 1197.  Where the complaint does not state a damages amount, or where the defendant

21   believes the complaint understates the damages amount, the defendant bears the burden to show

22   by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million.

23   *Id*.  As the Ninth Circuit explained in *Ibarra*, "[t]he parties may submit evidence outside the

24   complaint, including affidavits or declarations, or other summary-judgment-type evidence

25   relevant to the amount in controversy at the time of removal."  *Id*. (internal quotation marks and

26   citations omitted).  "Under this system, a defendant cannot establish removal jurisdiction by mere

27   speculation and conjecture, with unreasonable assumptions," and "CAFA's requirements are to be

28   tested by consideration of real evidence and the reality of what is at stake in the litigation, using

4

1  reasonable assumptions underlying the defendant's theory of damages exposure." *Id*. at 1197–98.

2  "[A] removing defendant is permitted to rely on 'a chain of reasoning that includes assumptions'"

3  although "such 'assumptions cannot be pulled from thin air but need some reasonable ground

4  underlying them.'" *Arias*, 936 F.3d at 925 (quoting *Ibarra*, 775 F. 3d at 1199).  Assumptions that

5  are founded on allegations in the complaint may be reasonable.  *Id*.

6                                    **ANALYSIS**

7          Here, plaintiff challenges defendant's removal of this action and argues that defendant

8  relied on speculative violation rates and vastly inflated approximations of employment data

9  (number of workweeks, employees, wage statements) in calculating its estimates and asserting

10  that the amount in controversy exceeds $5 million.[2]  (Doc. No. 14 at 2, 4–6.)  In particular,

11  plaintiff contends that even the Krock Declaration, which states the actual number of workweeks

12  and employees, shows that defendant's notice of removal and opposition brief vastly inflated the

13  amount in controversy by relying on speculative approximations from the Boehm Declaration.[3]

14  (Doc. No. 18 at ¶ 8.)  Plaintiff emphasizes that although Dr. Krock's declaration provides the

15  actual numbers for those relevant employment data points, defendant's calculations remain

16  speculative because Dr. Krock did not address violation rates at all.  (*Id*. at ¶¶ 9, 12, 13.)  Plaintiff

17  contends that because "defendant's purported expert had access to records containing that

18  information, such as time records," Dr. Krock's failure "to address the purely speculative

19  violation rates . . . is inexcusable."  (*Id*. at ¶ 9.)  According to plaintiff, defendant has not

20  _____

21  [2]  Plaintiff does not argue that the other two CAFA requirements—minimal diversity and
    minimum class size—have not been met.  (*See* Doc. No. 10 at 2, 6.)  Plaintiff is a citizen of
22  California, and defendant is a citizen of Michigan and Delaware, and employment records show
    that defendant has employed over 100 putative class members.  (*See* Doc. No. 1 at ¶¶ 8, 10, 13.)

23

24  [3]  Plaintiff devotes much of his motion to remand and reply brief to his arguments about the
    purported deficiencies and inflated approximations in the Boehm Declaration, which defendant
25  filed concurrently with its notice of removal.  (Doc. Nos. 10 at 6, 10–14; 14 at 2–6.)  However,
    defendant filed the Krock Declaration in response to the court's order requesting additional
26  evidence regarding the amount in controversy and now relies on the Krock Declaration, not the
    Boehm Declaration, for the employment data points it relies upon in calculating the amount in
27  controversy.  (*See* Doc. No. 17 at ¶ 19.)  Accordingly, the court need not address plaintiff's
    arguments regarding the sufficiency of the Boehm Declaration, which is no longer being relied
28  upon by defendant to calculate the amount in controversy.

submitted any actual evidence to support its assumptions about the violation rates, and the evidence before the court—plaintiff's time records—actually undercuts those assumptions because plaintiff's records show zero meal period violations during a period of twelve-and-a-half weeks, compared to defendant's assumption of one meal period violation per workweek.  (*Id*. at ¶¶ 3–4; Doc. No. 14 at 7–10.)  In addition, plaintiff contends that defendant has misconstrued the allegations of his complaint and makes unreasonable assumptions based on those allegations. (Doc. No. 14 at 6–7.)

Defendant argues that it is not required to identify the exact number of violations that allegedly occurred and use those exact figures in its calculations of the amount in controversy. (Doc. No. 13 at 6.)  Defendant maintains that its assumption of only one meal period violation per workweek and one rest period violation per workweek constitutes a 20% violation rate for those claims, not a 100% violation rate, the rate which plaintiff mistakenly claims that defendant utilized.  (*Id*. at 6–7.)  Moreover, defendant argues that the 20% violation rate is conservative and reasonable in light of plaintiff's allegations of a "pattern and practice" and a "corporate policy" of violations of California wage-and-hour law.  (*Id*. at 10.)  Applying the 20% violation rate and using the actual number of workweeks, number of employees, and the weighted average hourly rate of pay, as stated in the Krock Declaration, defendant updated its calculations and contends that the amount in controversy in this case is $8,161,767.25.  (Doc. No. 17 at ¶¶ 19–20.)  As shown in the following table, defendant's estimate includes amounts for plaintiff's meal period claim, rest period claim, minimum wages claim, and wage statement claim, as well as an amount attributed to attorneys' fees.  (*Id*.)

| Claim | Amount in Controversy | Calculation |
|---|---|---|
| Meal Period | $1,683,204.60 | 1 violation/wk * 109,299 workweeks * $15.40/hr |
| Rest Period | $1,683,204.60 | 1 violation/wk * 109,299 workweeks * $15.40/hr |
| Minimum Wage | $1,683,204.60 | 1 hr of unpaid work/wk * 109,299 workweeks * $15.40/hr |
| Wage Statement | $1,479,800.00 | 1,084 pay periods * $50 penalty for first violation + 14,256 pay periods * $100 penalty for subsequent violation |
| Attorneys' Fees | $1,632,353.45 | 25% of $6,529,413.80 subtotal |
| **Total:** | **$8,161,767.25** | |

/////

6

1       **A.      Supplemental Evidence Submitted by the Parties**

2       In response to this court's order "to submit additional evidence addressing the violation

3 rate and the disputed amount in controversy" (Doc. No. 15 at 3), defendant submitted the Krock

4 Declaration and plaintiff's time records (Doc. Nos. 17, 17-1), and plaintiff submitted a copy of

5 some of those same time records (Doc. No. 18-3.)

6       As to the time records, defendant does not explain what the various columns of

7 information in the time records represent at all, much less how any of that information supports

8 application of a 20% violation rate to calculate the amount in controversy for the meal period and

9 rest period claims.  Plaintiff also did not provide any description or explanation as to what

10 information is reflected in those time records.  Instead, plaintiff merely asserts in conclusory

11 fashion that his time "records show zero (0) meal period violations for the period from January 8,

12 2019 through April 12, 2019."  (Doc. No. 18 at ¶ 3.)  It is not evident to the court why plaintiff

13 would carve out this twelve-and-a-half week period as reflecting no meal period violations but

14 leave open the possibility, if not the implication, that the remainder of plaintiff's time records for

15 April, May, and June indeed show that meal period violations occurred.  The court has reviewed

16 the entirety of plaintiff's time records as provided by defendant and cannot readily discern any

17 material differences between those two time periods other than that in the first time period, a time

18 out from 11:00–11:30 A.M. is shown, compared with a time out from 12:00–12:30 P.M. during

19 the latter period.  (*See* Doc. No. 17-1 at 42–49.)  In any event, defendant has not challenged

20 plaintiff's characterization of his time records or put forth any argument that the time records

21 support defendant's use of a 20% violation rate.  Instead, defendant merely states that "[p]laintiff

22 may claim that his time records show no meal period violations, however, [p]laintiff has not

23 himself provided any declaration confirming no violations during this period."  (Doc. No. 17 at ¶

24 21.)  Without having any clarity from either party as to what precisely the time records show—

25 notably *how* the records show whether a meal period was provided, whether that meal period was

26 interrupted, and/or whether that meal period was late—the court cannot determine that plaintiff's

27 time records serve to either support or undercut defendant's assumed violation rate of 20% for

28 plaintiff's meal period claim.

As to the Krock Declaration, plaintiff does not challenge the actual number of workweeks, number of employees, and average hourly rate of pay that Dr. Krock calculated and stated in his declaration.  In that regard, Dr. Krock declared as follows:

> From February 7, 2016 through September 30, 2019 ("3-Year Period"), I identified 1,963 non-exempt employees with time worked.  Of those, 858 were current employees as of September 30, 2019, and the remaining 1,105 employees terminated during the 3-Year Period.  In total, the 1,963 employees worked 535,103 shifts, 109,299 weeks, and 74,551 pay periods.  The average hourly rate paid to these employees was $15.40.

> From February 7, 2019 through September 30, 2019 ("1-Year Period"), I identified 1,084 non-exempt employees with time worked.  Of those, 858 were current employees as of September 30, 2019, and the remaining 226 employees terminated during the 1-Year Period.  In total, the 1,084 employees worked 104,150 shifts, 22,146 weeks, and 15,340 pay periods.  The average hourly rate paid to these employees was $15.92.

(Doc. No. 17-1 at ¶¶ 17, 18.)  In his declaration, Dr. Krock explained the methodology he used to calculate those figures based on his review and analysis of the employment data and time records that defendant had provided him.  (*Id*. at 8–18.)  The court finds the Krock Declaration to be sufficient evidence of those employment data variables, which defendant utilizes in its calculations of the amount in controversy.  *See Varsam v. Lab. Corp. of Am*., No. 14-cv-2719-BTM-JMA, 2015 WL 4199287, at *3–4 (S.D. Cal. July 13, 2015) (applying employment data points as stated in expert declaration to calculate amount in controversy).  However, the Krock Declaration does not provide any evidence regarding the frequency of violations with respect to each of plaintiff's claims or the violation rate generally.  While it is true that defendants are not "required to comb through its records to identify and calculate the exact frequency of violations," *Andrade* 2019 WL 4855997, at *4 (citation omitted), nonetheless a defendant cannot pull a violation rate out of thin air, *Ibarra*, 775 F. 3d at 1199.  Thus, the Krock Declaration—alone—is not sufficient to support defendant's estimate of the amount in controversy.  *See Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175, 1186–87 (E.D. Cal. 2020) (concluding that evidence in the declaration "can be sufficient depending on the allegations in the [complaint]").

/////

8

1    "As is common in wage-and-hour cases, the amount in controversy turns on the frequency

2    of the alleged violations of California labor laws."  *Hayes v. Salt & Straw, LLC*, No. 20-cv-

3    03063-CJC-KSx, 2020 WL 2745244, at *3 (C.D. Cal. May 27, 2020) (citing cases).  Because

4    defendant has not submitted any evidence regarding the violation rates, the court will now

5    evaluate whether the violation rates defendant relied upon to calculate the amount in controversy

6    is based on a chain of reasoning and reasonable assumptions grounded in the allegations of

7    plaintiff's complaint.  *See Arias*, 936 F.3d at 925.

8              **B.      Violation Rates Used to Calculate Amount in Controversy**

9                        1.      Meal Period Violations

10   Under California Labor Code § 512(a), employers must provide an uninterrupted meal

11   period of not less than thirty minutes to employees who work more than five hours per day.  A

12   second meal period must be provided if an employee works more than ten hours per day.  Cal.

13   Lab. Code § 512(a).  Employers are required to pay an employee an additional one hour of pay at

14   the employee's regular pay rate for each workday that a compliant meal period is not provided.

15   *Id*. § 226.7(c).

16   Plaintiff alleges that "[d]uring the relevant time period, defendant[] failed to pay Plaintiff

17   and the other class members the full meal period premium due pursuant to California Labor Code

18   section 226.7."  (Compl. at ¶ 64.)  Plaintiff also alleges that one of the common questions of law

19   or fact as to all putative class members is "[w]hether defendant[] had a policy and practice of

20   failing to pay [its] hourly-paid or non-exempt employees within the State of California for all

21   hours worked and missed (short, late, interrupted and/or missed altogether) meal periods . . .."

22   (*Id*. at ¶ 16.)

23   Based on plaintiff's allegations, defendant assumes a 20% violation rate, i.e., that

24   defendant failed to provide its employees with a compliant meal period for one out of five

25   workdays per workweek.  (Doc. No. 1 at 7–8.)  Assuming this 20% violation rate, defendant

26   calculated an amount in controversy for plaintiff's meal period claim of $1,683,204.60 (=

27   $15.40/hour * 109,299 workweeks * 1 violation/workweek).  (Doc. No. 17 at ¶ 19.)  Defendant

28   argues that assuming a 20% violation rate here is reasonable because plaintiff alleges a common

                                             9

1   "practice" of meal period violations, and courts have routinely found defendants' assumptions of

2   one meal period violation per workweek to be reasonable in light of plaintiffs' "policy and

3   practice" allegations.  (Doc. Nos. 1 at ¶¶ 23, 24; 13 at 10–11.)  Defendant further argues that its

4   assumption is conservative because some courts apply even higher violation rates of 50% and

5   60% where plaintiffs allege a policy and practice of defendants failing to provide compliant meal

6   periods.  (Doc. No. 13 at 9–11.)

7        The court agrees that defendant's assumption of a 20% violation rate for plaintiff's meal

8   period claim is reasonable based on the language employed in the allegations of plaintiff's

9   complaint.  Following *Ibarra*, district courts have found violation rates between 25% to 60% to

10  be reasonable based on "pattern and practice" and "policy and practice" allegations.  *See Cavada*

11  *v. Inter-Cont'l Hotels Grp., Inc.*, No. 19-cv-1675-GPC-BLM, 2019 WL 5677846, at *4 (S.D. Cal.

12  Nov. 1, 2019) (citing cases); *see also Oda v. Gucci Am., Inc.*, No. 2:14-cv-07469-SVW, 2015 WL

13  93335, at *5 (C.D. Cal. Jan. 7, 2015) (finding that an assumed violation rate of 50% was

14  reasonable in light of allegations that defendant "maintained a policy or practice of not paying

15  additional compensation for missed meal and/or rest periods"); *Avila*, 432 F. Supp. 3d at 1189

16  (finding "a violation rate of 40%—a median between 25% and 60%—to be reasonable").

17  Moreover, "[c]ourts in this circuit have found that allegations of a 'pattern and practice' of

18  conduct support a 20% violation rate as reasonable."  *Danielsson v. Blood Centers of Pac.*, No.

19  19-cv-04592-JCS, 2019 WL 7290476, at *6 (N.D. Cal. Dec. 30, 2019) (citing cases).

20       Accordingly, defendant's use of a 20% violation rate to calculate the amount in

21  controversy as to plaintiff's meal period claim is reasonable because it is grounded in the

22  allegations of plaintiff's complaint.

23                        2.    Rest Period Violations

24       Under California Labor Code § 226.7(b), employers must permit employees to take rest

25  periods for ten minutes per four hours worked in a workday.  Employers are required to pay an

26  employee an additional one hour of pay at the employee's regular pay rate for each workday that

27  a compliant rest period is not provided.  Cal. Lab. Code § 226.7(c).

28  /////

                                         10

1    Plaintiff alleges that "[d]uring the relevant time period, Defendants required Plaintiff and

2    other class members to work four (4) or more hours without authorizing or permitting a ten (10)

3    minute rest period per each four (4) hour period worked." (Compl. at ¶ 71.) Plaintiff further

4    alleges that defendants "willfully required Plaintiff and the other class members to work during

5    rest periods and failed to pay Plaintiff and other class members the full rest period premium for

6    work performed during rest periods." (*Id*. at ¶ 72.) In addition, plaintiff alleges that one of the

7    common questions of law or fact as to all putative class members is "[w]hether defendant[] had a

8    policy and practice of failing to pay [its] hourly-paid or non-exempt employees within the State of

9    California for all hours worked and missed (short, late, interrupted and/or missed altogether) . . .

10   rest breaks in violation of California law." (*Id*. at ¶ 16.)

11          Based on these allegations, defendant assumes a 20% violation rate, i.e., that defendant

12   failed to provide its employees with a compliant rest period for one out of five workdays per

13   workweek. (Doc. No. 1 at 8–9.) Assuming this 20% violation rate, defendant calculated an

14   amount in controversy with respect to plaintiff's rest period claim of $1,683,204.60 (=

15   $15.40/hour * 109,299 workweeks * 1 violation/workweek). (Doc. No. 17 at ¶ 19.) Similar to

16   the meal period claim discussed above, defendant asserts the same arguments to justify its

17   assumption of a 20% violation rate for plaintiff's rest period claim. (Doc. Nos. 1 at 8–9; 13 at 9–

18   11.) Here too, the court agrees that defendant's assumption of a 20% violation rate for plaintiff's

19   rest period claim is reasonable in light of plaintiff's allegations of a "policy and practice" of rest

20   period violations. *See Palma v. Golden State FC, LLC*, No. 1:18-cv-00121-DAD-MJS, 2018 WL

21   3473971, at *5 (E.D. Cal. July 18, 2018) (finding a 25% violation rate for missed rest period

22   claim to be more than reasonable and quite conservative in light of the allegations in the

23   complaint, which spoke in absolutes); *Varsam*, 2015 WL 4199287, at *3 (finding that a 25%

24   violation rate "would be a conservative and reasonable assumption" based on allegations that

25   defendants "had a practice and/or policy of requiring Plaintiff and class members to clock out for

26   rest periods"); *Danielsson*, 2019 WL 7290476, at *6 ("Defendant's first assumption—a 20%

27   violation rate for meal and rest breaks during the putative class period—is reasonable given the

28   allegations of a 'pattern and practice' of such violations.")

Accordingly, defendant's use of a 20% violation rate to calculate the amount in controversy for plaintiff's rest period claim is reasonable because it is grounded in the allegations of plaintiff's complaint.

### 3.  Minimum Wage Violations

If an employer fails to pay its employees the minimum wage, California Labor Code § 1194 provides that "[n]otwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage . . . is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage . . ., including interest thereon, reasonable attorney's fees, and costs of suit."  In addition, the employee is "entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon."  Cal. Lab. Code § 1194.2.  Employers are also subject to a civil penalty, and that "amount shall be in addition to an amount sufficient to recover underpaid wages [and] liquidated damages."  *Id.* § 1197.1(a)(1).  The civil penalty is as follows:  "[f]or any initial violation that is intentionally committed, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee is underpaid," and "[f]or each subsequent violation for the same specific offense, two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid regardless of whether the initial violation is intentionally committed."  *Id.* § 1197.1(a)(1)-(2).

Plaintiff alleges that "[d]uring the relevant time period, Defendants failed to pay minimum wage to Plaintiff and the other class members," who are "entitled to recover the unpaid balance of their minimum wage compensation as well as interests, costs, and attorney's fees, and liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon."  (Compl. at ¶¶ 78–79.)  Plaintiff further alleges that he "and the other class members are entitled to recover a penalty of $100.00 for the initial failure to timely pay each employee minimum wages, and $250.00 for each subsequent failure to pay each employee minimum wages."  (*Id.* at ¶ 80.)

Despite the layered damages scheme available to employees who bring claims against their employers for failure to pay minimum wages, and despite plaintiff's allegations specifically seeking each available category of damages for such claims, defendant does not include any

1   amounts for liquidated damages and civil penalties in its estimate of the amount in controversy

2   with respect to this claim.  Rather, defendant purports to calculate an amount in controversy for

3   this claim by assuming "only one hour of unpaid *minimum wage* per workweek." (Doc. No. 1 at

4   ¶ 33) (emphasis added).  But instead of using the unpaid balance of the fixed minimum wage

5   amount or the minimum wage itself (whatever that might be; defendant does not state it),

6   defendant multiplies the average hourly rate of pay by the total number of workweeks that

7   employees worked during the relevant period.  (*Id*. at ¶ 33–34.)  Based solely on that calculation,

8   defendant contends that the amount in controversy for plaintiff's minimum wages claim is

9   $1,683,204.60 (= $15.40/hour * 109,299 workweeks).  (Doc. No. 17 at ¶ 19.)  It is not clear to the

10  court how defendant's calculation serves as an estimate for the amount in controversy of

11  plaintiff's minimum wages claim.  Defendant's description of its calculation is inconsistent with

12  what defendant's calculation is actually based upon.  If defendant's description of its calculation

13  is accurate, then the number of workweeks would be multiplied by the *minimum wage*, not the

14  average hourly rate of pay.  Without any evidence or assertion as to the applicable minimum

15  wage, the court will not speculate or attempt to otherwise correct defendant's calculation.

16         The court will neither ignore nor attempt to cure defendant's failure to provide a proper

17  calculation estimating the amount in controversy for plaintiff's minimum wage claim—i.e., one

18  that is rooted in the applicable damages scheme—such as a calculation applying a violation rate

19  to liquidated damages.  *Cf. Avila*, 432 F. Supp. 3d at 1190 (finding "a violation rate of 40% for

20  the initial failure to pay minimum wage and 20% for the second failure to be reasonable" such

21  that "[t]he calculation for the unpaid minimum wage claim, accordingly, should be: (2,660

22  employees x 40% $100) + (2,660 employees x 20% x $250) = $239,400"). [4]

23         Accordingly, the court will not include any amount for plaintiff's minimum wage claim.

24  /////

25  /////

26

27  [4]  In part the court declines to do so because here, unlike in *Avila,* the defendants failed to even
    provide the court with a liquidated damages calculation that would allow it to make its own
28  calculation.  Accordingly, any estimate the court could make would be based on pure speculation.

13

1              4.      Wage Statement Violations

2              Under California Labor Code § 226(a), an employer is required to provide its employees

3    with an accurate itemized wage statement showing the gross wages earned, the net wages earned,

4    the total number of hours worked, and the applicable hourly rates, among other items.  If an

5    employer fails to provide accurate wage statements as required, an employee may seek penalties

6    of $50 for the initial pay period in which a violation occurred and $100 for each subsequent pay

7    period with a violation, not to exceed an aggregate of $4,000 per employee.  Cal. Lab. Code

8    § 226(e).

9              Plaintiff alleges that defendant has "intentionally and willfully failed to provide Plaintiff

10   and the other class members with complete and accurate wage statements."  (Compl. at ¶¶ 42,

11   96.)  In particular, plaintiff alleges that "[t]he deficiencies include, but are not limited to:  the

12   failure to include the total number of hours worked by Plaintiff and the other class members."

13   (*Id*. at ¶¶ 33, 96.)

14             Based on these allegations, defendant contends that "an estimate of one wage statement

15   violation for every pay period" is reasonable.  (Doc. No. 1 at ¶¶ 36–38.)  Defendant further

16   asserts that because plaintiff also alleges a "pattern and practice" of meal and rest period

17   violations, it is reasonable to conclude that during any given pay period, at least one violation

18   occurred, resulting in an inaccurate wage statement for each pay period.  (*Id*. at ¶ 38.)  Based on

19   those assumptions, defendant essentially applies a 100% violation rate (i.e., that each of the wage

20   statements that the 1,084 employees received for the 15,340 pay periods they worked between

21   February 7, 2019 through September 30, 2019 was non-compliant and inaccurate).  (*Id*.; Doc. No.

22   17 at ¶ 19.)  Accordingly, defendant calculates the amount in controversy for plaintiff's wage

23   statement claim to be $1,479,800.00 ( = 1,084 pay periods * $50 penalty for first violation +

24   14,256 pay periods * $100 penalty for subsequent violation).  (Doc. No. 17 at ¶ 19.)

25             The court agrees that defendant's assumption of a 100% violation rate for plaintiff's wage

26   statement claim is reasonable here based on the allegations of plaintiff's complaint.  As discussed

27   above, the court found that it was reasonable to assume a 20% violation rate for both the meal

28   period and rest period claims—i.e., that at least one violation occurred every week.  It follows

14

that plaintiff alleges that every wage statement was non-compliant.  Plaintiff's wage statement claim is not only derivative in part of his allegations of meal and rest period violations; plaintiff also alleges that the wage statements failed "to include the total number of hours worked," along with other unspecified deficiencies.  (Compl. at ¶¶ 33, 96.)  Taken together, plaintiff's allegations support a reasonable assumption that every wage statement is alleged to have been non-compliant, justifying defendant's use of a 100% violation rate to calculate the amount in controversy with respect to plaintiff's wage statement claim.  *See Cavada*, 2019 WL 5677846, at *8 (finding that "since one missed meal and rest period was reasonable, that would mean that every wage statement was inaccurate and subject to the penalties" and concluding that "a 100% violation rate is a reasonable assumption based on these claims") (citing *Nunes v. Home Depot U.S.A., Inc.*, No. 2:19-cv-01207-JAM-DB, 2019 WL 4316903, at *3 (E.D. Cal. Sept. 12, 2019) (100% assumed violation rate was reasonable based on reasonable assumption that class members suffered at least one violation of meal or rest break violations)).

Accordingly, defendant's use of a 100% violation rate to calculate the amount in controversy for plaintiff's wage statement claim is reasonable because it too is grounded in the allegations in plaintiff's complaint.

5.    Attorneys' Fees

The following table summarizes the amounts in controversy that the court has found to be supported by the evidence and by reasonable assumptions grounded in plaintiff's complaint.  As shown below, the subtotal amount in controversy is less than $5 million.  Thus, unless a sufficient amount for attorneys' fees is included, the jurisdictional threshold is not met.

/////

/////

/////

/////

/////

/////

/////

15

| Claim | Amount in Controversy |
|---|---|
| Meal Period Violations | $1,683,204.60 |
| Rest Period Violations | $1,683,204.60 |
| Minimum Wage Violations | $0 |
| Wage Statement Violations | $1,479,800.00 |
| Subtotal: | $4,846,209.20 |
| Attorneys' Fees | - - - |
| **Total:** | **- - -** |

Defendant contends that the amount in controversy here should include attorneys' fees calculated using a "25% benchmark" of the subtotal amount.  (Doc. No. 1 at ¶ 44.)  However, the two cases that defendant cites to support application of a 25% benchmark pre-date the Ninth Circuit's recent opinion in *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 795 (9th Cir. 2018), in which the court explained that in the context of removal, "the defendant must prove the amount of attorneys' fees at stake by a preponderance of the evidence," and the court "may not relieve the defendant of its evidentiary burden by adopting a *per se* rule for one element of the amount at stake in the underlying litigation."  In *Fritsch*, the Ninth Circuit recognized that "in common fund cases, we have estimated reasonable attorneys' fees to be 25 percent of the total recovery," but nevertheless squarely rejected the defendant's argument that "as a matter of law, the amount of attorneys' fees in controversy in class actions is 25 percent of all other alleged recovery."  899 F.3d at 796.

Here, defendant has not made any effort to meet its burden of proving the amount of attorneys' fees at stake in this action by a preponderance of the evidence.  For example, defendant has not provided counsel's hourly rates or anticipated time expenditures from which an estimated lodestar could be calculated.  *See, e.g.*, *Gonzalez v. Comenity Bank*, No. 1:19-cv-00348-AWI-EPG, 2019 WL 5304925, at *11 (E.D. Cal. Oct. 21, 2019) (determining a reasonable estimate for attorneys' fees based on defendant's affidavit stating counsel's hourly rate and the court's knowledge of customary rates in comparable cases); *Reyes v. Staples Office Superstore, LLC*, No. 19-cv-07086-CJC-SKx, 2019 WL 4187847, at *5 (C.D. Cal. Sept. 3, 2019) (estimating amount of

16

attorneys' fees in controversy based on the plaintiff's attorney's admission of his hourly rate, together with the court's knowledge of customary rates and that comparable employment cases in that district tend to take between 100 and 300 hours to litigate through trial).

Consistent with the Ninth Circuit's opinion in *Fritsch*, the court will not relieve defendant of its evidentiary burden in this regard. *See also Avila*, 432 F. Supp. 3d at 1189 (calculating the amount in controversy without any amount for attorneys' fees where the defendant had failed to present evidence establishing that attorneys' fees of 25% was a reasonable estimate); *Salazar v. PODS Enters., LLC*, No. 19-cv-260-MWF-KKx, 2019 WL 2023726, at *9 (C.D. Cal. May 8, 2019) ("Because it is Defendant's burden to establish the amount of attorneys' fees for CAFA jurisdiction, the Court could follow the Ninth Circuit's mandate in *Fritsch* and simply use $0.").

**CONCLUSION**

For the reasons set forth above, the court finds that defendant has failed to meet its burden of showing by a preponderance of the evidence that the amount in controversy in this case exceeds the jurisdictional threshold of $5 million. In particular, defendant has submitted no evidence regarding its amount for attorneys' fees and has estimated an amount in controversy for plaintiff's minimum wage claim that is not reasonably grounded upon the allegations of plaintiff's complaint. As a result, defendant has shown by a preponderance of the evidence that the amount in controversy here is only $4,846,209.20, which is insufficient to establish that this court has jurisdiction over this action pursuant to CAFA.

Accordingly,

1.      Plaintiff's motion to remand (Doc. No. 10) is granted;

2.      This action is remanded to the Tulare County Superior Court for all further proceedings; and

3.      The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: **July 19, 2020**

_____
UNITED STATES DISTRICT JUDGE